## John H. Knox v. L. F. Pulliam.

A party who has made an entry of public land under a pre-emption law, and obtained the Receiver's receipt for the purchase money, has obtained an equitable right which cannot be ·defeated by a patent obtained through fraud and misrepresentation.

Where the Commissioner of the Land Office was induced by misrepresentation to cancel an entry so made and to order the land to be entered as school land, under a warrant presented by another party— Held: That the patent issued under the last entry inured to the benefit of the party making the first entry as the equitable owner of the land.

APPEAL from the District Court of the Parish of Pointe Coupée, Ratliff, J. A. Provosty, for plaintiff and appellant :

This is a petitory action for a tract of land of which the defendant is in possession. It is claimed by virtue of a patent issued by the State of Louisiana, under a certificate of the Register of the Land Office at New Orleans.

The plaintiff is the vendee of Nathan K. Knox, who had located the said tract of land, under a warrant issued by the State of Louisiana, and with the approval and confirmation of the land department.

The defendant avers. that he holds the land by a just title from the United States, as per Receiver's receipt of the 28th of November, 1855 ; and sets up fraud and error against the title of the plaintiff.

Such is the issue before this court ; the question of damages and improvements being reserved for future action.

The evidence substantiates the following facts : Nathan K. Knox applied, on the 11th August, 1855, to the Register of the Land Office at New Orleans, to locate school warrant, No. 1233, for 320 acres, on the south half of section 35, in township 5 of range 9, east. The register refused to entertain said application as made, and only allowed it for the portions not comprehended in the entries of Gayle & Leduf.

It appears that Benjamin Collins claimed lot No. 2 of said section, on an alleged settlement made in 1843 ; that on the 7th February, 1846, he went before E. Cooley, Parish Judge, and declared that it was his intention to abandon, and that he did abandon lot No. 2, of sec. 35, township 5, range 9, east, and all intention to claim the same. It further appears, that on the same day, before the same officer, E. Cooley, Parish Judge, Mathew Gayle declared his intention to claim said lot, on the ground that he had settled and improved it ; that on this declaration and application, the Register of the Land Office allowed the said Gayle to enter not only lot No. 2, but the entire south-west quarter of section 35.

On the other hand, it also appears, that one Honoré Leduf, f. m. c., was allowed to enter the south-east quarter of section 35, under the preëmption Act of the 4th September, 1841, after the time allowed by the 5th section of the Act of 3d of March, 1843. These two entries, Gayle's and Leduf's, so illegal and unjustifiable, so surprised the Commissioner of the Land Office as to cause him to write to the Register the letter of inquiry of the 12th February, 1855 ; in his answer, the Register admits the illegality of Leduf's entry, and argues as to that of Gayle, that the law allowed him the quantity of land he obtained ; to this Commissioner Wilson replies :

" Your decision adverse to the claim of Honoré Leduf is approved, and his entry has accordingly been cancelled. In the case of Mathew A. Gayle, he should be restricted to lot No. 2 of south-west quarter, section 35, township 5, 9 east, for which he filed a declaratory statement ; a new certificate must, therefore, be issued to him for this said lot, &c., or if the party desire it, the whole entry will be vacated, and the purchase money returned. If issued, send on the new certificate in a special communication, referring to the date of this."

To this decision, Gayle has always refused to submit, and no new certificate has ever been issued.

It was under these circumstances, Leduf's entry being cancelled, Gayle's entry restricted to lot No. 2, and he refusing to submit and claim this lot, that plaintiff's vendor tendered his warrant on the 11th August, 1855, for 320 acres of

KNOX
v.
PULLIAM.

land, that is, the south-half of section 35, in township 5, range 9 east. This application was rejected by the Register, for the portions comprehended in the entries of *Gayle* and *Leduf*, and these entries, it will be seen, included all the lands applied for. Why the Register, in view of his own decision in regard to *Leduf's* entry, and of that of the Commissioner in relation to that of *Gayle*, should have refused the application of *Knox*, or restricted it to the 94 acres, which in fact were covered by *Gayle's* entry, is more than we can understand and explain. *Knox* had then but one course to pursue, that is, to appeal to the land department for redress ; he did so ; but before his demand could receive the decision of that proverbially slow office, he learned that efforts were made to deprive him even of the lot of 94 acres, which, under the decision of the Commissioner, could not be claimed by *Gayle*, and were untouched by *Leduf's* entry ; before anything could be heard from Washington, the Register had granted the tract to *Pulliam*, the defendant in this case. All these facts were again laid before the land office, and they were so grossly illegal, as to prompt the Commissioner, *Hendricks*, to interpose, and to write to the Register his letter of March, 1856, in which he states :

" You erred in not permitting said location, (the one applied for by *Knox*,) so far as the tract in said south half of section 35 was vacant, and that in consequence, the subsequent entry of *Lewis F. Pulliam*, per certificate of the north half and south-west quarter of south-west quarter of section 35, allowed by you, and predicated upon an alleged settlement, is without authority of law, and it has therefore been cancelled."

*Knox's* application was then received by the Register, and it being approved by the Secretary of the Interior, which approval bears date the 29th of April, 1856, the patent in evidence was then issued in his favor by the State of Louisiana.

So that our right to this tract of land, of 94 acres, which is the only one at present under contestation, is sustained, first, by a prior application ; second, two decisions of the land department ; third, the approval of the Secretary of the Interior ; fourth, the patent. To an unprejudiced mind, it really requires some stress on the brain to understand how the defendant can defeat it.

We have read with great attention the authorities quoted by the defendant in the lower court, and have failed to discover in them anything that conflicts in the slightest degree with our claim ; in fact, properly applied, we believe they strengthen it. In the Kittridge case, 4 R. 83, the patent had clearly been issued in error, and obtained by a suppression of facts within the knowledge of the party who applied for it. In *Dufresne* v. *Haydel*, 7 A. R. 663, the right of the plaintiff to an equitable division of the land was secured to him by the Act of Congress of 1811 ; and it was clear that the *inequitable* action of the surveyor could not deprive him of it. In 2 Howard, *Stoddard* v. *Chambers*, the Supreme Court of the United States merely decided that, if two patents be issued for the same land by the United States, and the first in date be obtained fraudulently and against law, it does not carry the legal title.

We will ask, in what consists the error of the Commissioner of the Land Office, and of the Secretary of the Interior, and the fraud of plaintiff ? What facts did the letter suppress ? Were not these officers aware of *Pulliam's* entry, and of the circumstances under which it was received by the Register ? Where is the defendant's patent ?

If the issuing of a patent is a ministerial act, which must be performed according to law to be binding, what else is the act of the Register, and of what force will it be if done against law and equity ? *Mr. Palms* knew that *Leduf* had no legal title to any part of the land claimed by plaintiff, himself admits it in his letter ; and he knew the cancellation by his controlling officer of *Gayle's* entry, to whom the right of having a new certificate issued for lot 2, if he choose to avail himself of it, was reserved, and the refusal of *Gayle* to submit ; and knowing all these facts, he refused to receive the application of plaintiff : and why ? He, *so prolix on other points, is exceedingly reserved on this* ; and the same officer, while the appeal of plaintiff is before the land department, allows *Mr. Pulliam* to enter a portion of the land. Is not all the fraud and all the error in the case on the side of defendant and the Register ?

The inferior court, in this decision, states, " that it has been the policy and practice of the General Government to permit the first applicant to enter land when he conforms to the laws and regulations of the land department." This is

certainly correct. 2 Land Laws, page 479 ; and as *Knox* is the first applicant, his claim should prevail.

" *Mr. Knox*, on the 11th August, 1855," pursues the Judge, " applied to the Register to locate a school warrant on the south half of section 35, containing 320 acres ; so far, he was undoubtedly the first applicant ; the Register refused to permit him to enter said land, informing him that he would entertain his application for the portion not comprehended in the entries of *Gayle* and *Leduf*." Now, *these entries included the whole land* applied for by plaintiff ; he could, therefore, refuse to accept with good grace ; he was entitled to the whole, except lot No. 2, and even, perhaps, to lot No. 2, for *Gayle* refused, and still refuses, to avail himself of the tender made to him of the lot by the government ; and under the very decisions quoted by defendant's counsel, plaintiff's right, as the first applicant for vacant land, would have defeated defendant's patent, had the government, instead of giving it to *Knox*, erroneously granted it to the former.

The Judge of the lower court further says : " Here, (after *Mr. Knox's* refusal to accept the land not included in *Leduf's* and *Gayle's* entries,) so far as the evidence informs us, and as the Register was informed, *Mr. Knox* seems to have abandoned his intention to locate his school warrant on section 35, and we hear no more of him until the 12th March, 1856."

On what fact does the court predicate the assumption that *Knox* had abandoned his intention to locate, the record does not inform us. What could he do but to prefer his claim to the department at Washington ? And if, as usual, on account of the press of business in that office, the matter lingered there without decision, is he to suffer ?

" It is a well established principle," said Judge McLean, in the case of *Lytle* v. *State of Arkansas*, 9 How., " that when an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case the preëmption right of *Cloyes* having been proved, and an offer to pay the land claimed by him, nothing more could be done, and nothing more could be required of him under the Act.

So, here, *Knox* having presented his warrant on the land, which was vacant, and the Register having refused to entertain his demand, nothing more could be done by him but to appeal.

And such is the course indicated by the land department ; see Laws and Opinions, 2d vol., p. 489 ; " It appears," said the commissioner, " that *H.* applied as early as the 12th November for the purchase of a tract of land, then subject to private entry, and tendered the money ; he had undoubtedly at the time a right to enter the land, and if, when his application was refused by the Register through misapprehension, he had appealed to this office, I should have had no hesitation in directing the Register to receive it ; nor could an application from any other individual during the interim have prejudiced his claim.

These instructions so completely cover this case as to leave us nothing to add, but to refer to the Act of Congress of 1836, §1, which gives to the Commissioner a supervision over the official acts of the Register and Receiver.

So much for the equity of the case, and the reasons of the lower court. The authorities are also clearly on our side ; we made the first application ; defendant's entry has been cancelled by the proper department ; ours approved by the same authority ; we have the patent. Are mere suppositions, that we abandoned our claim, mere surmises as to our intentions ; mere charges of want of diligence, to overcome these high evidences of title ?

The presumption certainly is, that the patent is valid and passed the legal title. 18 Howard, 88. The entry of *Pulliam* was set aside before the patent was issued, and it has been determined by this tribunal, that in such a case, it cannot revise the decision of the land office ; *Haydel* v. *Nixon*, 5 A. R. 559 ; and the power of the Commissioner to set aside such an entry is undoubted ; 2 A. R. 302 ; 4 A. R. 364 ; 9 Rob. 288 ; 19 R. 339 ; *Gantreaux* v. *Boote*, 10 A. R. 139.

It is well settled, said C. J. Merrick, in the case of *Butler* v. *Watts*, 13 A. R. 391, that the action of the land department upon questions of this kind is final, and that the courts, as a general rule, are without power to revise the decision of such department, specially entrusted by the government with jurisdiction over the surveys, location, settlements upon, and sales of the public lands.

*Robert H. Bradford*, for defendant and appellee :

This is a petitory action.

On the 11th of August, 1855, *James Barron*, as plaintiff's agent, applied to the Register of the Federal Land Office at New Orleans, to locate school warrant 1233 on the entire south half of section 35, township 5 south, of range 9 east, in the South-Eastern District, Louisiana, west of the Mississippi River. The warrant issued for 320 acres due T. 12 south, R. 17 E. The Register applied to *Mr. Barron*, in answer to the application, that the warrant could not be located on *all* the land applied for, because the south-east quarter of the section, and lot 2, (or the south-east quarter of the south-west quarter) had been previously disposed of by the United States. But the Register added, that the north half of the south-west quarter, and lot 1, (or the south-west quarter of the south-west quarter,) were vacant, and liable to location by the plaintiff under the warrant tendered. But *Barron* declined this offer, saying that *Knox's* letter of instructions required the entry of *all* the south half of the section; that plaintiff's warrant was for 320 acres; that he had no instructions from the plaintiff to locate less than 320 acres; and that, if he could not get the entire south half of the section, he could not sacrifice the warrant on the portion offered by the Register. That portion only contained 94.52 acres. The response of the Register to *Barron's* application, and *Barron's* rejoinder, are the only facts at issue. The record clearly sustains these facts as detailed above, and contains no evidence to rebut them.

The plaintiff's agent having refused to locate the lots containing 94.52 acres, defendant entered them as a *preëmptor*, on the 28th November, 1855, thus allowing the plaintiff since the 11th August, 1855, the date of his application, to hear from his agent; to amend or renew his application; or to procure instructions from Washington, compelling the Register to reverse his alleged misconduct in refusing the application.

On the 20th of March, 1856, the Commissioner of the General Land Office, in answer to a request preferred on behalf of plaintiff on the 12th of March, wrote to the Register, requiring him to cancel the entry of defendant as erroneous, and to allow the entry of plaintiff. The only objection of the plaintiff to the preëmption of defendant, is, that the sale to defendant was subsequent to the illegal refusal by the Register, to entertain the application by plaintiff for the land in controversy. In other respects, the preëmption of defendant is unquestioned and unquestionable. Fraud is not alleged against it, yet fraud is the only ground on which it could now be attacked. Act 29th May, 1830, section 3; *Lytle* v. *Arkansas*, 9 Howard, 314; Public Lands, Instructions and Opinions, pp. 98 and 99; *Barton* v. *Hempkin*, 19 L. 510; *Morancy* v. *Ford*, 2 A. 299; *Courtney* v. *Perkins*, 5 An. 216; *Kellam* v. *Rippey*, 3 R. 138. The Commissioner's letter assigns the following reasons for disallowing defendant's entry:

"It is the opinion of this office that you erred, in not permitting said location, so far as the tracts in said south half of sec. 35, which were then vacant, and that in consequence, the subsequent entry of *Lewis F. Pulliam*, per certificate No. 3434 of the north half and south-west quarter of south-west quarter section 35, allowed by you on the 28th November, 1855, and predicated upon an alleged settlement in September, 1855, is without authority of law, it has therefore been cancelled." Coerced by this extraordinary instruction, the Register, on the 31st March, 1856, allowed the plaintiff, by agent, to locate the land designated by the Commissioner. On this location, a patent issued from the State to the plaintiff, who sued for the land in the parish of Pointe Coupée, where it lies.

The court below rendered judgment for the defendant. In the progress of the trial, the defendant offered in evidence a diagram of the *locus* in dispute, certified by the Register at New Orleans to be a true copy of the *original* filed in his office. The plaintiff objected to the evidence. The objection was overruled, and the plaintiff excepted, on the ground that the diagram should have been certified by the Federal Surveyor General. The bill of exception quotes the case of *Lawrence* v. *Grout*, 12 An. 836. That case may be invoked by the defendant, but not by the plaintiff. The facts and opinion in the case only deny to a Register the power to certify that a diagram is a true copy of certain sections "taken from the map of said township, on file in this office;" and only show that the Register must certify the diagram to be a copy of the *original* map. In the case before this court, the certificate of the Register is sustained by *Lawrence* v. *Grout*, for the Register distinctly states the diagram to be copied from the original. The general rule, that the Federal Surveyor General is the only person competent to certify copies of township maps, is admitted by defendant. It is sanctioned by *Millaudon* v. *McDonogh*, 18 L. 103, and many other authorities. But the reason-

ing which sustains the rule, sustains also the evidence excepted to in this case. The rule is founded on the assumption, that the Surveyor General possesses the original map. When, as in the present case, the Register possesses an original map also, under a law precluding the presumption that such map is a *copy*, Act 10th May, 1800, secs. 1 and 8, the rule applies to certificates · by the Register, as well as to certificates by the Surveyor General. *Boatner* v. *Smith*, 1 R. 546. But, an admission that the map in the Register's office is a copy, does not destroy the efficacy of the diagram certified by him. That paper was offered merely to illustrate the basis of the sales to the plaintiff and defendant, respectively. For this purpose the diagram is competent and *exclusive* evidence. The sales in question were founded, not on the map in the Surveyor General's office, but on the map in the Register's office. Copies certified by the Surveyor General may be exclusive evidence of things occurring before the approval of the map; but they are incompetent evidence of things which, like the rival entries in this case, necessarily occur after the approval of the map, and in an office distinct from that of the Surveyor General. Between the maps in the Surveyor General's office, and corresponding maps in the Register's office, there may be, and often are, discrepancies. The sales in a township, subsequent to the approval of the township map, are required by law to be noted on the map in the Register's office only. Act of 10th May, 1800, sec. 8. These considerations show that the evidence objected · to by the plaintiff, is better than any other evidence which could be produced.

The only issue remaining to be discussed is, the simple question, whether the land entered by plaintiff on the 31st March, 1856, was then liable to entry, or whether it was not rather the property of defendant, who was then in possession of the land, whilst the ·government was in possession of the consideration paid by him for the land.

The Register and Receiver are only *federal agents* " for the disposal of the lands of the United States, lying in the Eastern Land District of the territory of Orleans." Act 3d March, 1811, sec. 3; see also section 6 of same Act. In the sale to defendant, those officers acted within the scope of the authority conferred by section 6 of that Act. Their principal is, therefore, bound. Smith's Mercantile Law, 1 Am. ed. 158. And it is unnecessary for this purpose that the *form* of the contract be binding on the government, provided the government is, *ex æquo et bono*, obliged to recognise the sale to defendant. *Williams* v. *Winchester*, 7 N. S. 22; *Ballister* v. *Hamilton*, 3 An. 401; *Carlisle* v. *Steamer Eudora*, 5 An. 15.

In defendant's entry, the contract of sale is distinct from the *evidence* of the contract, (C. C., Art. 1755,) and was complete as soon as the agreement existed between him and the land ·officers, fixing the land and the price, and before delivery or payment. C. C. 2414, 2431; *Copley* v. *Dowell*, 1 R. 26; *Barrett* v. *Creditors*, 12 R. 474. Even if the officers had refused the tender of defendant, still the subsequent sale to the plaintiff would have been voidable, or void, supposing the tender to have been legal. Opinion of Benjamin F. Butler, Attorney General of the United States, Public Lands, Instructions and Opinions, pp. 213, 214, No. 149. The general maxim in the contract of sale, as enunciated in the Civil Code, 2414, 2431, is the only principle which can justify the doctrine of *Lynch* v. *Postlethwaite*, 7 M. 213, that the effect of the contract is governed *lege locis contractus, although delivery should occur abroad*. It is therefore unessential, that the federal patent should issue to defendant, for, to the very equivocal rule that nothing *but* a patent vests a perfect title to public land, the law recognizes many exceptions. *Climer* v. *Selby*, 10 An. 182. The federal preëmption laws, for example, vest a *legal* title in the preëmptor, on payment according to them, so that the government cannot afterwards wrest the land from him. *Kittridge* v. *Breaud*, 4 R. 82, 83, affirmed; *Climer* v. *Selby*, 10 An. 182; *Godeau* v. *Phillips*, 3 L. 62; and at best, the issuing of a patent is a ministerial act, *Stoddard* v. *Chambers*, 2 Howard, 284, which passes no title, but is only evidence that a title may have previously vested. *Goodlet* v. *Smithson*, 5 Porter, (Ala.) 245. These limitations of the dignity of patents sustain the doctrine that neither a patent, nor an Act of Congress will be suffered to impair the prior title of a holder under a conveyance from government agents. *Culliver* v. *Garic*, 11 L. 90; *Kittridge* v. *Breaud*, 4 R. 79; and sustain also the decision in *Jackson* v. *Wilcox*, 1 Scammon (Ill.) 344, that the Register's certificate (such as defendant holds) is of equal authority with a patent. The decision in *Jackson* v. *Wilcox* may be regarded as

KNOX
v.
PULLIAM.

assuming very high grounds; but the same point has been expressly decided in the federal courts, *Astrom* v. *Hammond*, 3 McLean, 107, and harmonizes with the fundamental doctrine of the Civil Code, and other authorities above quoted, that the patent is simply evidence of a title which really vested on the consent of the vendor and vendee, or at farthest, on payment; for if the patent is simply evidence of a prior title, the certificate of purchase is also evidence of a prior title, and the two differ, not in kind, but in degree only. The land passed to defendant with the delivery of the certificate, (*Fleckner* v. *Grieve*, 4 M. 694,) in virtue of the officers' consent thereby expressed or reiterated, that the vendee should take possession, (*Cuvillier* v. *McDonogh*, 6 M. 564,) and thereby the right of possession and the right of property theretofore subsisting in defendant, were joined to the *fact* of possession, so that now defendant's physical possession, which is necessarily assumed by the petitory action instituted against him in the court below, perfects his title without necessity for ulterior steps. For a written contract, whereby A declares that he has sold to B a certain lot for a certain price, is completely valid, though mentioning that another instrument remains to be executed. *Poeyfarré* v. *Delord*, 6 M. 11. It were better that B should have the contemplated instrument, as it is better that defendant should have the patent contemplated in his certificate; for these documents are respectively portions of the evidence of title, insomuch, that unless the vendor be protected by the prerogatives of sovereignty, he may be sued for damages or for specific performance. But the beneficence of the law will not subordinate the rights of an innocent vendee to the caprice or fraud of a vendor, by treating the patent, or other usual consummation of title as a *sine qua non*, by demanding its production under pain of judicial reprobation. No man is required to do that which is vain, or impossible. Co. Litt. 29 *a*. 231 *b*. The law is too equitable to demand *all* the evidence of which a given fact is susceptible; it allows litigants reasonable choice of proofs, and will excuse the non-production of proofs which, as in this case, have been improperly withheld from a litigant by a third person for and to whom defendant is irresponsible, and from whose injustice there is no appeal save to the justice of a State tribunal.

The sale to defendant, therefore, being complete by the Register and Receiver, and the certificate which issued to him, and the patent yet due him possessing no inherent significance, but being only evidence of the precedent sale, a fact unrestricted to any specific mode of proof, it follows that the whole title, legal and equitable, was in defendant before the alleged inception of plaintiff's title, and that neither the Federal Government, in approving plaintiff's location, nor the State Government in patenting it, conferred on him any title; for it is a rule applying to all grants, that they cannot affect previous titles, so that if the thing granted was not in the grantor, no right passes to the grantee. *New Orleans* v. *Armas*, 9 Peters, 224; *New Orleans* v. *United States*, 10 Peters, 662; Holcomb's Dig. 374, No. 3; but the grant is absolutely void. Holcomb's Dig. 374, No. 4. No person can transfer to another a greater right than the transferrer possesses. Pothier Oblig. 263. These general rules are immediately applicable to the case at bar. Plaintiff's warrant was located under the second section of the Act of 20th May, 1826, which restricts its location to "unappropriated public lands;" and the 1st section of the Act of 3d Aug., 1854, declares, that where a selection, such as plaintiff's location amounts to, covers land not intended to be granted by the Act authorizing the selection, which, in this case, is the Act of 20th May, 1826, such selection shall be void, and shall convey no right whatever. To hold that a selection or location of school lands, under the Act of 1826, can embrace lands appropriated, and thereby rendered private property, is to assign to the Act of '26 a power withheld from Congress by the Constitution. That instrument declares that "the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Art. 4, sec. 3, part 2. In order to sustain plaintiff's location, we must therefore admit, that on the 31st March, 1856, the date of plaintiff's location, the land located remained public, notwithstanding the prior legal sale to defendant. That this sale has been cancelled by the Commissioner, is no answer to this argument. The defendant held his land under the preëmption laws, a higher authority than the Commissioner, whose cancellation of the sale, if unsanctioned by law, is a mere nullity. *Perry* v. *O'Hanlon*, 11 Miss. 585. The Commissioner's order to the Register, to annul the location of defendant and permit the location of plaintiff, is illegal. The Register's obedience to the order is illegal.

The duty of the Register to disobey improper instructions from the department, is expounded by the department. The Commissioner, in his letter of 27th September, 1823, to the Register at Marietta, says that instructions from the department are not paramount to the law; and that it is the duty of every officer receiving instructions from the department to compare them with the law and with previous instructions, and to construe them compatibly with the law of the land. Public Lands, Instructions and Opinions, 372, No. 295. Had this judicious and necessary rule for the construction of departmental instructions been applied by the local office to the pretensions of the plaintiff, this suit would have been prevented.

The principle announced in *Perry* v. *O'Hanlon*, 11 Miss. 585, is sanctioned by a subsequent decision of the same court, that a vendee of federal lands, after doing all that the law requires to entitle him to a patent, cannot be affected by the ignorance, negligence, or unfaithfulness of the government or its officers. *Nelson* v. *Sims*, 23 Miss. 383. These decisions of a sister State are commended to this court, no less by the contiguity of the jurisdiction in which they originated, than by the consideration that until 1831, the land in controversy in those cases was, in common with that involved in the case at bar, under the official control of the Surveyor General then presiding in Mississippi, Act 3, March, 1831, and is still subject to common rules for interpreting titles issuing from the Federal Government. They are likewise vindicated by the instructions of the department. A settler, who applies to prove and enter his preëmption before the end of the period limited by law, cannot be defeated by a vacancy in the Register's office. Public Lands, Instructions and Opinions, 639. When a person, conformably to an Act of Congress, enters land and does all he can to fulfil the law, but is prevented from completing his purchase and paying the money by failure of the United States to perform its obligations, he cannot, therefore, be deprived of his rights. Ib. 213.

It is admitted that the State and Federal Courts have, in many instances, attributed more importance to mere patents than consists with the preceding authorities. In *Pepper* v. *Dunlap*, 9 A. 137, for example, the court remarked that a Federal patent for land conclusively proves a severance and a divestiture of the Federal title, which until then may have remained unchanged, notwithstanding a sale and the receipt of the price by the government. But, even this sweeping case is ineffectual to sustain plaintiff's pretensions; for it decides, also, that the patent, to whomsoever issuing, always enures to the benefit of him to whom the patentee is bound to convey it, or for whose use he ought legally to hold it. Thus qualified, the decision favors the defendant. What matters it, whether the government retains the fee or not, so long as the land is in defendant's possession and paid for, and that, too, under the guaranty that the patent whensoever, howsoever and to whomsoever issuing from the United States, must enure to his benefit? So, in *Metoyer* v. *Larenandière*, 6 R. 139, it is distinctly enunciated that until patent, the title is unchanged; but there the court only referred to an ordinary settlement claim for 640 acres—an inchoate right scarcely attaining the dignity of an equitable title—a mere gratuity, petitioned for by the party under a latitudinous construction of the treaty of Paris, and thereby tacitly admitted by him to require the interposition of the Legislature to *donate* to him the land settled, and the interposition of the executive to enforce the donation by patent. The party begged that a boon might issue to him *ex gratia*. The defendant demands the recognition of a preëxisting title, *ex debito justitiæ*. For defendant's equitable title of preëmptor has merged by payment into a mature legal title, investing him with the same right to the tract in controversy, with which Spain, France and the United States were successively invested, and with such additional rights as accrue to him from specific severance and specific divestiture in his favor. Moreover, *Pepper* v. *Dunlap* and *Metoyer* v. *Larenandière*, though negatively sanctioning the title of defendant, cannot be invoked by the plaintiff. Those cases apply to Federal patents. Plaintiff does not pretend to hold the Federal patent. No Federal patent has ever issued either to him or to his grantor.

Without attempting a further discussion of the hasty decisions and dicta which the books contain to the effect that patents are essential to complete a title, it is better to state some general doctrines which underlie all the cases on the subject; and here the admission implied above is repeated, that in different courts and cases, and at different times, various and conflicting views have been expressed,

17

KNOX
v.
PULLIAM.

amplifying or restricting the dignity of patents. Many of the decisions, explain them as we may, assign to patents an authority not justified by the nature of the instrument.

In the early history of our State and Federal jurisprudence, the questions most frequently arising in land cases were those relating to Spanish patents. The law and learning applicable to them will be found chiefly in Martin's Reports, and in the contemporaneous Federal Reports. These decisions have too often served to interpret and apply the patents emanating from the General Government upon sales of the domain, irrespective of the distinctions between Spanish and Federal patents. But, really, between these venerable precedents and cases involving titles by purchase from he United States, there is little congruity. Spain disposed of her crown lands gratuitously and solely with a view to their settlement by Spanish subjects. American State Papers. Public Lands III, 62. The fee, therefore, until patent, was necessarily in the sovereign, and, when the fee passed, the patentee paid no consideration. The patent issued *ex gratia*, and not as a *quid pro quo.* It was a royal charity, hostile to the assumption of a previous title in the subject. It remained defeasable for nonperformance of conditions subsequent, laws, &c., relating to the public lands, 2 Appendix, 204, in which case the government could lawfully grant the land to another subject. Id. ib. 204. *Bossier* v. *Metoyer*, 5 M. 679 ; *Pontalba* v. *Copeland*, 3 A. 86. But the United States alienates the public land for a fixed pecuniary equivalent, which vests in the purchaser a title untrammeled by conditions, and therefore indefeasible. Had the land officers, in selling the tract in question, been agents of a company, they could have refused defendant's tender of money, could have preferred plaintiff's subsequent tender, and the defendant would have been remediless. But, being Federal agents, and being properly applied to, they were constrained to sell. Public Lands, Opinions and Instructions, 213, 639. *Marsh* v. *Gonsoulin*, 16 L. 84. The General Government bought the province of Louisiana from France for a valuable consideration, which, practically considered, was paid by the people. The land, therefore, is held in trust for the people. The provisions in the Federal Constitution for the sale of the public domain, the Act of 4th Sept., 1841, and the implied terms of the trust, compel the sovereign trustee to sell ; for otherwise the trust is unavailing. The treaty of the 30th April, 1803, was founded chiefly on the theory that the prospective Federal population would need the land acquired by the treaty for purposes of settlement and cultivation. Our benevolent preëmption system is an illustration of that theory. It follows, that the essential design of this trust was amply fulfilled when the land officers in New Orleans, as agents of the trustee, transferred the land in question to the defendant, in consideration of his preëmption and of the price paid by him.

In sales of realty the vendee generally receives his deed when the vendor receives the money for the land. Had this usage prevailed in the sale to defendant this suit might have been averted. Why did it not prevail ? Why was the evidence of title suspended after the title had passed? It was to subserve the questionable convenience of the government ; to gratify a vague apprehension that if the ultimate evidence of title should emanate from New Orleans instead of Washington, collusion between the vendee and the Federal agents to sell might, by possibility, ensue. The injustice, litigation and confusion resulting to the people from the harrassing suspension of their patents at Washington, is matter of general history, of which this court will take judicial notice. Many of the public lands remain unpatented, though sold years ago. Not a tithe of the private claims in the State have been patented. The treaty of 1803 contained a solemn guarantee that the citizens of the ceded province should be protected in their rights of property. Those rights have not been protected. Their very evidence has been withheld by the power which bound itself to maintain them. The great mass of titles in Louisiana, at the date of the treaty, were unpatented, and existed only in the imperfect form of permissions to settle, orders of survey, and plats and certificates of survey. The patent of Spain was essential to clothe these equitable titles with legal vestments. Had the title of the province remained unchanged, these inchoate rights would soon have been perfected, for the interval between a Spanish survey and the patent issuing upon it, was never greater than the necessity of each case required, and was usually but a few months. See American State Papers. Public Lands III, D. Green's ed., p. 35, et seq.

It is the doctrine of the Supreme Court of the United States, that the government, by the treaty, assumed all the obligations in regard to inchoate titles, which

had previously devolved on France and Spain. This doctrine results from the principles of international law and from the terms of the treaty. Prominent among the obligations thus imposed on the government, is the duty of issuing Federal patents to parties claiming under Spain by inchoate titles. Has this duty been performed? Claimants under Spain, in common with claimants under the United States, have suffered so long from the apathy of the government, that their grievances have become part of our judicial annals. The delay in issuing patents is frequently prolonged until intervening descents and sales raise serious questions as to the right of any particular person to receive the patent. Meanwhile, receipts and other original evidence of property are often lost, thus compelling the true owner of the land either to abandon all hopes of getting his ultimate evidence of title, or to apply for such evidence to tardy officials, to assume the burden of proof in the essential allegations, to resort to formulas and technicalities alien or hostile to the civil law, and to suffer all the expenses and embarrassments incident to business transacted with a remote and irresponsible office, through the instrumentality of lengthened correspondence or distant agents. The government, instead of attempting to remove the difficulties necessarily caused by these delays in issuing patents, has enhanced those difficulties in many cases by executing resurveys of land sold or confirmed. These resurveys are always *ex parte*, and occasion endless confusion among the lines and corners of the tracts resurveyed. They frequently occasion gross departures from original locations and areas, and too often afford pretexts to the government for coercing land owners to receive titles according to the modified locations and contents, or to abandon their lands to the government. England, France and Spain properly empowered their several colonial authorities to issue ultimate evidences of title without the intervention of the crown, and without any necessity for appealing in each case to the home government. We are accustomed to regard the year 1803 as the dawn of superior enlightenment and of superior civil liberties; but the relations between the government and the land owner in Louisiana, prior to the treaty of Paris, exhibited a regard for the rights of the owner, and a promptness in the completion and protection of his title which the American Government has never imitated. A review of the land system of our Government, as practically administered in the departments at Washington, affords us but little reason to congratulate ourselves upon the change of government resulting from the treaty of Paris.

The indifference of the government to the discharge of its duties, should stimulate the courts of the country to mitigate, as far as possible, the hardships resulting to the people. Since the government will not issue patents when they become due; since the excellent precedents of England, France and Spain, in empowering the local officers to issue patents, have been abjured by the United States, the judiciary should, on all proper occasions, sustain and enforce such primary evidences of title as the defendant produces in the case at bar and should not demand evidences which are merely cumulative in their nature, and which depend for their very inception upon the caprice of an unknown and irresponsible ministerial officer. If the sovereign vendor, after receiving the consideration from the vendee, delays for his own exclusive convenience, the transfer of the acquittance or evidence usually given by private vendors, and thereby, as in the case at bar, extends to third persons facilities for filching the land from the true vendee, and that too by *ex parte* proceedings, it is respectfully contended that the State courts should rebuke such oppression by the federal authorities, preclude those authorities from taking advantage of their own wrong, and prevent the second vendee from degrading the authority of a court to the consummation of injustice. That the defendant cannot sue the United States for the patent due him, and cannot sue for damages for its detention, constitutes a powerful argument for the defendant. If men are bound in reason and in conscience to comply voluntarily with their legal duties, a *fortiori* is a government bound. The very exemption of a sovereignty from suit should render the sovereignty anxious to discharge its liabilities. The very dependence of the citizen should secure in his behalf the parental solicitude of his government. Governments, and the attributes of governments, are devised for the protection of the people; and the immunity of the government from litigation is designed, not to protect the government in acts of oppression, but to contribute to its authority and permanency, and to afford its beneficence and magnanimity an opportunity of securing to the government the veneration and devotion of the citizen.

The power of this tribunal to apply the general principles of right and of our State jurisprudence to the case at bar, is apparent from the case of *Widow Dufresne* v. *Haydel*, 7 An. 660. In that case the defendant, a back preëmptor, held under a federal survey, duly approved and patented. Plaintiff held a contiguous preëmption under the usual certificate of purchase, but contended that an equitable division of the land had not been made, and that she was entitled to buy land embraced in the defendant's patent entry. The court sustained her claim on the broad ground, that in selling its domain, the federal government and the vendees were bound by the principles applicable to ordinary vendors and purchasers, and that, therefore, although the issuing of a federal patent irrevocably vests the title in the patentee, yet, if the land already belonged to another person, such subsequent patent enures to the true owner's benefit. And see *Sprigg* v. *Hooper*, 9 R. 248. The doctrines governing the relationship of principal and agent, also show that the solution of the case at bars depends on local law. Contracts with an agent are construed according to the law of the agent's domicil, and not according to the law of the principal's domicil. *Oliver* v. *Lake*, 3 An. 78 ; *Bent* v. *Lauve*, 3 Ann. 88 ; *Kling* v. *Sejour*, 4 An. 128. In defendant's case, the vendee and government agents reside in Louisiana, the subject of the sale is land in Louisiana, the agreement was made and the money was paid in Louisiana, the certificate of purchase, which represented the land, was delivered in Louisiana, and the contract must, therefore, be governed by Louisiana law.

The reports of our own State, and of other States in the Union, abound with cases illustrating the application of local law to the interpretation of titles issuing upon sales of land by the general government. Many of these decisions are immediately in point. An unpatented certificate of entry is a better equitable title than a junior patent certificate, so that the patented title will be avoided in equity at the instance of the first purchaser. *Hester* v. *Kembrough*, 12 S. & M. 659. See *Climer* v. *Selby*, 10 An. 82 ; and Holcomb's Dig. 481, No. 14. Patents are voidable or void for mistake or fraud, or if sustained, may inure not to the patentee, but to the party actually entitled. Ann. Dig. for 1847, p. 334, No. 56 ; *Nelson* v. *Moon*, 3 McLean, 319 ; 10 An. 133 ; *Bell* v. *Hearne*, 10 An. 515 ; *Davis* v. *Fletcher*, 11 An. 506 ; *Jackson* v. *Hart*, 12 Johnson, 76 ; *Wilcox* v. *Jackson*, 13 Peters, 498 ; *Stoddard* v. *Chambers*, 2 Howard, 284 ; *Kittridge* v. *Breaud*, 4 R. 83. The case last cited is conclusive. In that case, *Kittridge*, a back preëmptor, bought certain land in the vicinity of his front tract under the 5th section of the Act of 3d of March, 1811, as revived by the 7th section of the Act of 11th of May, 1820, S. C. 2 R. 40. Afterwards, discovering that he had not bought his complement of acres, he purchased another parcel. Both sales were sustained by corresponding surveys, but the second one was not shown on the approved township map. After the second sale an ordinary preëmptor, having no notice of the second sale upon the face of the map, entered part of the land embraced in that sale. Pending the litigation which ensued from these conflicting sales, defendant, by concealing the conflict, got a federal patent for his entry. There was judgment for plaintiff, reversing the judgment below. The court remarked, that "the patent, in this case, bears date August 31st, 1842, since the period when this case was last before us, and the judgment in favor of the defendant reversed. He, therefore, knew of the existence of the claim of the plaintiff, and must have concealed it from the knowledge of the Commissioner of the General Land Office, and the President, otherwise a patent would not have been issued. We will not permit a party to benefit himself by suppressing a portion of the facts when he applies for a patent, when they are within his knowledge. The benefit of the patent must inure to the plaintiff, who is, in our judgment, entitled to recover the land." *Kittridge's* case had much to weaken it, and *Breaud's* case had much to render it plausible. *Kittridge* had been guilty of *laches*. His right of entry accrued on the 3d of March, 1811. He suffered years to elapse without making the entry, and when he did tardily comply with the offer of the government, he neglected to enter as much as he was entitled to enter, and did not buy the deficit in the rear of his front tract until after the Act of May 11, 1820. No sale under the 5th section of the Act of 3d of March, 1811, was legal without a corresponding survey. To admit, therefore, that a back preëmptor, who is bound to know the size of his front tract, can, to humor his own whim or interest, enter part of his back preëmption at one time and enter the remainder many years after, is to admit that the surveying department is the mere slave of the preëmptor's caprice, and is bound to make surveys, *ad infini-*

*tum*, until the aggregate of such surveys may amount to the contents of the entire front tract. The *argumentum ab inconvenienti*, if not fatal to such a theory of partial entries, shows at least that those entries can only be upheld by a very strained interpretation of the equity of the Act of 3d of March, 1811, and the Acts reviving its provisions from time to time. On the other hand, the position of *Breaud's* entry was a strong one. The department had neglected the duty of delineating *Kittridge's* last entry on the map.          *          *          *          *

The preceding portion of this argument has proceeded on the supposition that the formalities accompanying the inception of plaintiffs' title are legal. But, the legality of those formalities is very questionable. Plaintiff's title is founded on the first and second sections of the Act of 20th of May, 1826. The second section of the Act declares that the school land, authorized to be located by the first section, "shall be selected by the Secretary of the Treasury." The obvious intention of the Act is, that the selection shall precede the appropriation, and shall be made by an indifferent and sworn agent of the government. In the case at bar both the intent and letter of the law have been violated. Selection and appropriation occurred contemporaneously, and were effected not by an agent of the government, but by the agent of the plaintiff, by a party whose interests are opposed to the interests of the government, and who is not restrained by the obligations of an oath or of an official station from pursuing his intersts.

The policy of the Act of 1826 has been evaded, as well as the spirit and letter of the Act. Its policy is to discourage *floats*, but the evasion by the plaintiff, if upheld, destroys this policy and makes the location of a school warrant dependent on the pleasure of the holder. Floats are always mischievous. They are continually perverted to purposes of speculation at the expense of the actual settler. The case before this court is a significant illustration of the inconvenience, immorality and injury resulting from floats. Had the Act of 1826 been complied with in this case, the defendant would only have been opposed by the government; private interests would not have intervened to defeat an investigation of the conduct of the Register, and the title of defendant; and this suit would have been obviated. There can be no float by intendment of law; for it it a title *sui generis*—conferring extraordinary power on the holder, and is never created but by express law, to meet an express emergency. No such law has been invoked by plaintiff. None such is in existence. And the very proceedings on which he relies to maintain his float commend the consideration of defendant's title to the attention of this court. Plaintiff's entry is embraced in Report 28 of the Register at New Orleans. That entry, in obedience to the 3d section of the Act of 3d August, 1854, was affirmed by the Secretary of the Interior, " subject to the legal rights of others, existing at the time said selections were made known at the District Land Office." The Record throughout shows that defendant had an incontestible title to the land in question, at the time of plaintiff's entry. Therefore, the rights of the defendant were saved, and plaintiff took nothing by the affirmance in Washington of his pretended location.

It is important to observe, that the register did not refuse plaintiff's application on the ground of the entry by *Gayle* of the whole S. W. quarter of sec. 35 ; he " refused on the ground that the S. E. quarter of section 35 had been selected for schools, per State school warrant No. 655, under Act of 26th May, 1826, and the lot No. 2 of the S. W. quarter of said section was claimed by *Mathew C. Gayle*, per certificate No. 3395, under Act of Congress of 4th September, 1841." *Gayle* had entered the whole quarter, but the entry had been partly cancelled, and only covered the S. E. quarter of the S. W. quarter, or lot two of the S. W., at the time of plaintiff's application.

MERRICK, C. J.   The plaintiff claims, in virtue of a patent issued by the State of Louisiana, the north half of the south west quarter and lot No. 1, of section 35, in township 5, range 9 east, in the south eastern district of Louisiana, west of the Mississippi, containing 94 54–100 acres.

The defendant claims to be the equitable owner of the land, and alleges fraud on the part of the plaintiff. The judgment of the lower court being in favor of the defendant, the plaintiff appeals.

It is conceded, that the title is out of the government of the United States.

It appears that " on the 11th of August, 1855, *James Barron*, as *W. K. Knox's*

agent, applied to the Register of the Federal Land Office at New Orleans, to locate school warrant 1233 on the entire south half of section 35, township 5 south, of range 9 east, in the south eastern district, Louisiana, west of the Mississippi river. The warrant issued for 320 acres due T. 12 south, R. 17 E. The Register replied to *Mr. Barron*, in answer to the application, that the warrant could not be located on *all* the land applied for, because the south-east quarter of the section, and lot 2, (or the south-east quarter of the south-west quarter,) had been previously disposed of by the United States. But the Register added that the north half of the south-west quarter, and lot 1, (or the south-west quarter of the south-west quarter,) were vacant, and liable to location by the plaintiff under the warrant tendered. But *Barron* declined this offer, saying that *Knox's* letter of instructions required the entry of *all* the south half of the section ; that plaintiff's warrant was for 320 acres ; that he had no instructions from the plaintiff to locate less than 320 acres ; and that, if he could not get the entire south half of the section, he could not sacrifice the warrant on the portion offered by the Register. That portion only contained 94.52 acres."

On the 28th day of November, 1855, the defendant entered the 94 52–100 acres by preëmption, and obtained the receiver's receipt for the purchase money.

Thus matters stood until the 20th day of March, 1856, when it appears that the Commissioner of the General Land Office was induced by *ex parte* misrepresentations contained in a letter dated March 12th, 1856, to order the defendant's entry to be cancelled and the land to be entered as school land, under *William K. Knox's* warrant for 320 acres. The misrepresentation, (as it is quite transparent from the letter of the Commissioner,) consisted in suppressing the fact, that *Knox's* agent had refused, on the 11th of August, 1855, to enter the smaller quantity of land under his warrant for 320 acres, and inducing the Commissioner to suppose that the plaintiff had applied to the land office to make such entry prior to the entry of defendant by preëmption ; whereas, in truth, he had refused to sacrifice his warrant. The defendant, therefore, by his entry, which was legally and rightfully made, obtained an equitable right which cannot be defeated, and plaintiff's title must be held to enure to the benefit of the defendant.

In a recent review of the law on this subject the Supreme Court of the United States said :

" The question is, have courts of justice power to examine a contested claim to a right of entry under the preëmption laws, and to overrule the decision of the Register and Receiver, confirmed by the Commissioner, in a case where they have been imposed upon by *ex parte* affidavits, and the patent has been obtained by one having no interest secured to him in virtue of the preëmption laws to the destruction of another's right, who had a preference of entry, which he preferred and effected in due form, but which was defeated by false swearing and fraudulent contrivance brought about by him to whom the patent was awarded ?"

" The general rule is, that where several parties set up conflicting claims to property, with which a special tribunal may deal, as between one party and the Government, regardless of the rights of others, the latter may come into the ordinary courts of justice and litigate the conflicting claims. Such was the case of *Comegys* v. *Vasse*, 1 Peters, 212, and the case before us belongs to the same class of *ex parte* proceedings ; nor do the regulations of the Commissioner of the General Land Office, whereby a party may be heard to prove his better claim to enter, oust the jurisdiction of the courts of justice. We announce this to be the settled doctrine of this court."

The court proceeds, "It was in effect so held in the case of *Lytle* v. *State of Arkansas*, 9 Howard, 328, next in the case of *Cunningham* v. *Ashley*, 14 Howard, and again in the case of *Bernard* v. *Ashley*, 18 Howard, 44." *Jones* v. *McMasters*, 20 Howard Rep. p. 8.

This court held the same doctrine in the case of *Wiggins* v. *Guier*, 13 An. 356. The plaintiff, *John H. Knox*, has no better right than his immediate vendor, *W. K. Knox*.

The judgment of the lower court, which deprives the plaintiff of the unjust advantage obtained by his *ex parte* representations, must be affirmed.

Judgment affirmed.